UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON


OHIO VALLEY ENVIRONMENTAL COALITION, INC. and
WEST VIRGINIA HIGHLANDS CONSERVANCY, INC. and
SIERRA CLUB and
COAL RIVER MOUNTAIN WATCH, INC.,

       Plaintiffs,

v.                                    Civil Action No. 2:12-6689

UNITED STATES ARMY CORPS OF ENGINEERS and
THOMAS P. BOSTICK, Commander and Chief of Engineers,
U. S. Army Corps of Engineers, and
STEVEN MCGUGAN, Colonel, District Engineer,
U. S. Army Corps of Engineers, Huntington District,

       Defendants

and

RAVEN CREST CONTRACTING, LLC,

       Intervenor Defendant.


MEMORANDUM OPINION AND ORDER


       Pending is a motion for partial summary judgment filed on April 8, 2013, by plaintiffs Ohio Valley Environmental Coalition, Inc., West Virginia Highlands Conservancy, Inc., Sierra Club, and Coal River Mountain Watch, Inc. ("the plaintiffs").  Also pending are a motion for partial summary judgment filed on May 10, 2013, by defendants United States Army Corps of Engineers, Lieutenant General Thomas P. Bostick, and

1

Colonel Steven McGugan (collectively, "the Corps" or "the defendants"), and a motion for partial summary judgment filed on the same day by intervenor defendant Raven Crest Contracting, LLC ("Intervenor" or "Raven Crest").

The issues presented in this case relate to a permit issued on August 10, 2012 by the Corps pursuant to the Clean Water Act ("CWA") § 404, codified at 33 U.S.C. § 1344 (2006), for Raven Crest to conduct surface coal mining activities at the proposed Boone North No. 5 Surface Mine, a 725-acre site in Boone County, West Virginia, near the communities of Peytona and Racine.  In short, the plaintiffs allege that the Corps, when issuing the § 404(b)(1) permit that allows Raven Crest to mine-through streams and to place fill material in streams, was required to, but did not, properly consider detrimental human health effects associated with surface coal mining.  See Compl. ¶ 1.

The plaintiffs are nonprofit organizations that espouse preservation of the environment and the responsible use of natural resources.  Plaintiff Ohio Valley Environmental Coalition is a nonprofit organization incorporated in Ohio, with a principal place of business in Huntington, West Virginia, and it has roughly 1,000 members that reside in various states, including some in West Virginia.  "Its mission is to organize

2

and maintain a diverse membership dedicated to the improvement and preservation of the environment through education, grassroots organizing and coalition building, leadership development and media outreach." Compl. ¶ 9. West Virginia Highlands Conservancy is a nonprofit organization incorporated in West Virginia, with roughly 1,600 members who "work for the conservation and wise management of West Virginia's natural resources." It utilizes "citizen efforts to protect West Virginia's people, land, and water resources from the harmful effects of coal mining." Compl. ¶ 10. Sierra Club is a nonprofit California corporation, with about 2,000 members residing in West Virginia. Sierra Club advocates for the responsible use of natural resources and for environmental conservation. Compl. ¶ 11. Plaintiff Coal River Mountain Watch is an organization begun in West Virginia with a mission to "stop the destruction of West Virginia's communities and environment by mountaintop removal mining, to improve the quality of life in West Virginia and to help rebuild sustainable communities." Compl. ¶ 12.

Under the Clean Water Act, the Army Corps of Engineers, acting on behalf of the Secretary of the Army and through the Chief of Engineers, "may issue permits, after notice and opportunity for public hearings for the discharge of dredged

or fill material into the [waters of the United States][1] at specified disposal sites." 33 U.S.C. § 1344(a). Raven Crest has intervened as a defendant in this action, as it is the company that applied for and received the permit from the Corps to conduct discharge activities on the site.

---

[1] The Clean Water Act prohibits discharges into "navigable waters." At first blush, the small streams such as those at issue in this case may not be thought to be "navigable waters," as that term ordinarily conjures thoughts of waterways capable of supporting vessels. But the CWA defines "navigable waters" as "the waters of the United States," 33 U.S.C. § 1362(7) (2006), and the Supreme Court has interpreted that definition to include streams with "a continuous flow of water in a permanent channel." Rapanos v. United States, 547 U.S. 715, 733 & n.5 (2006) (plurality opinion). See also Deerfield Plantation Phase II-B Prop. Owners Ass'n, Inc. v. United States Army Corps of Eng'rs, 501 Fed. App'x 268, 272-73 (4th Cir. 2012).

Some confusion arises because the Corps also makes decisions under the Rivers and Harbors Act of 1899, which has a different definition of "navigable waters". 33 U.S.C. § 401, 403 (2006) (Rivers and Harbors Act of 1899); 33 U.S.C. § 1362(7) (2006 & Supp. II 2008) (Clean Water Act). Within its own regulations, the Corps uses "navigable waters of the United States" to mean those waters over which it maintains jurisdiction pursuant to the Rivers and Harbors Act of 1899, and "waters of the United States," to mean the waters the Corps has jurisdiction over under the CWA. 33 C.F.R. § 320.1(d) (2013). See also 33 C.F.R. pts. 328-329 (2013) (defining each).

To avoid further confusion, the court shall refrain herein from using the term "navigable waters," instead using only "waters of the United States," because the Rivers and Harbors Act has nothing to do with this case.

Also important is that no party alleges that the streams at issue in this case were not "waters of the United States" or that the Army Corps was without jurisdiction over them.

## I.  Background

A. Regulatory Law

The permitting process for surface coal mining involves navigating an interlocking web of statutes, agencies, and regulations at both the federal and state level, so a brief overview of the relevant law is in order.

### 1. The SMCRA

The Surface Mining Control and Reclamation Act ("SMCRA"), 30 U.S.C. §§ 1202-1328, directs regulation of surface mining activities through a system of "cooperative federalism," with responsibility shared between state governments and the Secretary of the Interior.  Bragg v. West Virginia Coal Ass'n, 248 F.3d 275, 288 (4th Cir. 2001).  Under the law, states may implement and enforce their own surface mining regulatory programs with "exclusive jurisdiction", provided that the Secretary of the Interior first approves the program.  See 30 U.S.C. § 1253 (2006); Bragg, 248 F.3d at 288.  If a state has not set up its own program, the Department of the Interior will regulate surface mining operations within that state.  30 U.S.C. §§ 1252(e), 1254 (2006).  Either the state or the federal government may regulate mining activities, but not both; these alternatives are mutually exclusive.  Bragg, 248 F.3d at 289. To obtain approval, the state program must require compliance at

5

or above federal minimum standards, provide for adequate enforcement mechanisms through state law, and maintain a sufficiently competent and adequately funded state regulatory body.  30 U.S.C. § 1253(a-b); Bragg, 248 F.3d at 288-89; 30 C.F.R. §§ 731.12-731.14, 732.15 (2013).  The minimum standards contemplate, among other things, the protection of the health and safety of workers and the public, appropriate reclamation of mined lands after mining concludes, efficient mining of resources, protection of flora and fauna, maintaining hydrologic balance,[2] and protection of important cultural and historic sites.  30 C.F.R. § 810.2 (2013).  West Virginia has an approved SMCRA program that is administered by the West Virginia Department of Environmental Protection ("WVDEP").  30 C.F.R. §§ 948.1-948.30 (2013).  The mine at issue in this case was issued a SMCRA permit by WVDEP on September 9, 2009; that permit's validity is not disputed.[3]

2. The CWA

Against this backdrop lies the Clean Water Act

---

[2] "Hydrologic balance means the relationship between the quality and quantity of water inflow to, water outflow from, and water storage in a hydrologic unit such as a drainage basin, aquifer, soil zone, lake, or reservoir. It encompasses the dynamic relationships among precipitation, runoff, evaporation, and changes in ground and surface water storage."  30 C.F.R. § 701.5 (2013).

[3] Permit No. S-5006-08.

("CWA").  The law requires entities to obtain a permit from a
federal agency for certain discharges of materials into the
waters of the United States.  The particular permit at issue in
this case is a CWA § 404(b)(1) permit, codified at 33 U.S.C.
§ 1344(b)(1).  As noted, such permits are granted by the Corps,
acting on behalf of the Secretary of the Army and through the
Chief of Engineers, for "the discharge of dredged or fill
material" into U.S. waters, after giving notice and opportunity
for a public hearing.  33 U.S.C. § 1344(a).  The Corps issued
such a permit for the mine in this case on August 10, 2012.

As required by 33 U.S.C. § 1344(b), the Environmental
Protection Agency (the "EPA"), in conjunction with the Corps,
has promulgated guidelines for the Corps to follow in issuing
CWA § 404(b)(1) permits.  See 40 C.F.R. §§ 230.1-230.98 (2013).
Among the factors the Corps must consider is whether the
discharge "will cause or contribute to significant degradation
of the waters of the United States."  40 C.F.R. § 230.10(c)
(2013).  Under the regulations, effects on (1) "human health or
welfare"; (2) "aquatic life and other wildlife dependent on
aquatic ecosystems"; (3) "aquatic ecosystem diversity,
productivity, and stability"; or (4) "recreational, aesthetic
and economic values" may contribute to significant degradation.
Id.  The Corps must make a written determination of the effects

7

of discharge "on the physical, chemical, and biological components of the aquatic environment."  40 C.F.R. § 230.11.

The CWA also mandates, under CWA § 402, codified at 33 U.S.C. § 1342 (2006 & Supp. II 2008), a separate system of cooperative federalism with regard to pollution arising from wastewater, namely, the National Pollution Discharge Elimination System ("NPDES").  NPDES allows for states with federally approved programs to issue permits for the discharge of pollutants into the waters of the United States.  Id. § 1342(b). WVDEP issued an NPDES permit on May 27, 2009, and the proper issuance of an NPDES permit is not at issue in this case.

The CWA provides for yet another state-issued certification under CWA § 401(a)(1), codified at 33 U.S.C. § 1341(a)(1).  A state agency may certify any project requiring a federal permit that "may result in any discharge" into waters of the United States where the discharge originates within that state's jurisdiction.  33 U.S.C. § 1341(a)(1) (2006).  The state agency decides whether a number of standards are met under the CWA, among them are effluent limitations, water quality standards and toxic pollutant standards.  See id.; 33 U.S.C. §§ 1311-1313, 1316-1317.  The federal permitting process may not go forward until the state grants § 401 certification or waives such approval.  § 1341(a)(1).  Certification under CWA § 401 was

8

granted by the WVDEP for the mine in this case on May 13, 2011; its issuance is not contested here.

### 3. NEPA

The National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-4370h, requires federal agencies to take a "hard look" at the environmental consequences of agency action. Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 350-51 (1989).  NEPA does not require specified outcomes, but rather mandates that an agency follows a procedure designed to ensure that the agency makes informed decisions.  Id.  NEPA requires an agency to prepare an Environmental Impact Statement ("EIS") for "major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(C) (2006).

To determine what agency actions are significant enough to require an EIS, the Corps relies on its own regulations and on regulations promulgated by the Council on Environmental Quality ("CEQ") -- an entity created by NEPA and vested with the authority to regulate the implementation of NEPA by other agencies.  See Andrus v. Sierra Club, 442 U.S. 347, 357-358 (1979); Warm Springs Dam Task Force v. Gribble, 417 U.S. 1301, 1310 (1974) (Douglas, J., in chambers) (affording "great weight" to CEQ determinations); Executive Order 11,991, 42 Fed.

9

Reg. 26,967 (May 24, 1977); 40 C.F.R. § 1500.3 (2013).  In
accordance with both sets of regulations, the Corps prepares a
"concise public document" called an Environmental Assessment
("EA") to examine whether an EIS is required.  40 C.F.R. §§
1501.3, 1508.9 (2013); 33 C.F.R. § 230.10 (2013).  If no EIS is
required, the Corps will prepare and issue a Finding of No
Significant Impact ("FONSI"), which may be combined in the same
document as the EA.  33 C.F.R. § 230.11 (2013); 40 C.F.R. §
1508.13 (2013) (defining a finding of no significant impact).

     For the purposes of determining significant impact
when composing the EA, the Corps must examine both the context
and intensity of the proposed action.  40 C.F.R. §§ 1502.3,
1508.27 (2013).  Among the factors examined in determining
intensity are "[t]he degree to which the proposed action affects
public health or safety."  Id. § 1508.27(b)(2).  The Corps must
consider direct effects, reasonably foreseeable indirect
effects, and cumulative effects of the proposed action.  Id. §
1508.8.  Also the Corps must, in the EA, discuss alternative
proposals and their impacts.  Id. § 1508.9.  "Even where an EA
determines that a proposed action will have a significant
environmental impact, an agency may avoid issuing an EIS where
it finds that mitigating measures can be taken to reduce the
environmental impact of the project below the level of

10

significance." Ohio Valley Environmental Coalition v. Aracoma
Coal Co., 556 F.3d 177, 191-92 (4th Cir. 2009).  "In these
situations, the agency can issue a 'so-called mitigated FONSI.'"
Id. at 192 (quoting Spiller v. White, 352 F.3d 235, 241 (5th
Cir.2003)).

In this case, the Corps conducted an alternatives
analysis.  Among other things, the plaintiffs fault the Corps
for not considering human health effects as a part of that
analysis.

4. Public Interest Review

Independent of any CWA or NEPA guidelines, the Corps
has developed its own general policies for evaluating every
permit that it issues, whether that permit is issued under the
authority of the CWA or another statute.  See 33 C.F.R § 320.4
(2013).  Those regulations provide that the Corps conduct a
"public interest" analysis:

> The decision whether to issue a permit will be based on an
> evaluation of the probable impacts, including cumulative
> impacts, of the proposed activity and its intended use on
> the public interest. Evaluation of the probable impact
> which the proposed activity may have on the public interest
> requires a careful weighing of all those factors which
> become relevant in each particular case. The benefits which
> reasonably may be expected to accrue from the proposal must
> be balanced against its reasonably foreseeable detriments.
> . . . For activities involving 404 discharges, a permit
> will be denied if the discharge that would be authorized by
> such permit would not comply with the Environmental

> Protection Agency's 404(b)(1) guidelines. Subject to the
> preceding sentence and any other applicable guidelines and
> criteria . . ., a permit will be granted unless the
> district engineer determines that it would be contrary to
> the public interest.

Id.  The Corps asserts authority to promulgate such regulations
under the Rivers and Harbors Act, 33 U.S.C. § 401 et seq.; the
Clean Water Act § 404, 33 U.S.C. § 1344; and § 103 of the Marine
Protection Research and Sanctuaries Act of 1972, 33 U.S.C. §
1413 (2006).  Final Rule for Regulatory Programs of the Corps of
Engineers, 51 Fed. Reg. 41,206, 41,220 (Nov. 13, 1986).

B. The Permit Application and Proposed Mine

On October 29, 2009, Raven Crest applied to the Corps
for a CWA § 404(b)(1) permit, relating to a part of a proposed
surface coal mine projected to affect Roundbottom Creek, Mill
Branch, and their unnamed upper tributaries ("UT").  Application
for Department of the Army Permit, Administrative Record
("A.R."), Tab 7, at 21 [hereinafter "Application"].[4]  Roundbottom
Creek and Mill Branch are both direct tributaries of the Big
Coal River.  Department of the Army Permit Evaluation and
Decision Document, A.R., Tab 81, at 1 [hereinafter "Decision"].
Mill Branch meets the Big Coal River near Racine, while
Roundbottom Creek meets the Big Coal River near Peytona.

---

[4] For convenience, the court shall refer to the Administrative
Record as "A.R." throughout.

Application, Ex. 4.  As the proposed mine is located within

Boone County, West Virginia, it naturally occurs in an area with

varying elevation.  See Topographical Location Map, A.R., Tab 7.

To accommodate for the varying topography, the proposal

contemplates a number of mining methods including area mining,

contour mining, auger mining, and highwall mining.  Application

15.

Raven Crest desired to "mine-through" (i.e., excavate

and backfill) the land containing over 12,000 linear feet of

streams.[5]  Application 24, Table 3.  "'[M]ining through' is the

---

[5] The Corps' decision states that

> The project would impact a total of 15,079 linear feet of
> streams . . . .  Mining through streams (excavation and
> backfill) would impact 700 feet of perennial, 8,518 feet of
> intermittent, and 5,861 feet of ephemeral streams.
> Construction of five temporary in-stream sediment control
> ponds would impact 1,108 feet of perennial stream [and]
> 1,555 feet of intermittent stream.

Decision at 2.  But the above-indicated stream impacts from
mining-through alone add to 15,079 linear feet -- the total
amount of feet the Corps says is affected.  The numbers do not
add up, as the stream impacts from the sediment control
structures should be included in the total 15,079 feet as well.
Upon further inspection, it appears that the mining-through will
affect 5,612 linear feet of intermittent streams, as Raven Crest
indicates in its application, not 8,518 feet.  See Application
at 24, Table 3; Compensatory Mitigation Plan, A.R. Tab 49, at 2,
Table 1.  Therefore, mining-through streams would impact a total
of 12,173 linear feet: 700 feet of perennial, 5,612 feet of
intermittent, and 5,861 feet of ephemeral streams.
    In Raven Crest's first proposal, it also included 243 feet
of intermittent stream adjacent to an area near a cemetery that
may need restoration as stream length affected by mine-through,

13

process of scraping away the surface of an ephemeral stream bed,
extracting the coal seams that are then exposed, and refilling
the stream bed." Kentuckians for the Commonwealth v. United
States Army Corps of Eng'rs, 746 F.3d 698, 707 n.2 (6th Cir.
2014). "[S]urface mining laws require that the drainage from
both hollow fills and 'mine through' areas pass through sediment
control ponds or structures before being discharged into
downstream waters." Id. at 703 n.1 (quoting Kentuckians for the
Commonwealth v. United States Army Corps of Eng'rs, 963 F. Supp.
2d. 670, 673 (W.D. Ky. 2013)). So, Raven Crest proposed
"drainage control structures," or ponds and ditches designed to
collect waste, affecting roughly an additional 2,600 linear feet
of streams. Application at 18-19. Some of those structures
consist of five ponds used to collect sediment waste; they are
proposed to be constructed within current streambeds. These
ponds are designed to let suspended particulate matter settle
before the water flows downstream. Raven Crest would also
create other ditches around the perimeter of the site to collect

---

but then later switched it to stream length affected by the
sediment ponds. Compare Application at 24, Table 3 with
Compensatory Mitigation Plan, A.R. Tab 49, at 2, Table 1. The
Corps appears to have included this with the mine-through
affected streams, yielding 12,416 feet as the stream length
affected by mine-through when the 243 feet is added to the
12,173 feet. See Decision at 3 (referring to "12,416 feet of
stream affected by mine-through").

   Adding in the 2,663 feet of impacts from the sediment
control ponds to this 12,416 feet yields a total effect, as
indicated, of 15,079 linear feet.

sediment in drainage.  These ditches do not intersect waters of
the United States, "except for those locations where the ditches
intersect (cross) small hollows or ephemeral channels."  Id. at
18.

     The excavated earth, called spoil, must be placed
somewhere during and after mining.  Commonly, mining companies
will propose "valley fills," where the spoil is dumped into an
adjacent valley, often destroying waterways, vegetation, and
animal habitats.  Raven Crest did not propose any valley fills
in connection with this mine.  Rather, its plan includes placing
the spoil back on the mining site in roughly the same topography
with which the site began (called "Approximate Original Contour"
or "AOC").  Id. at 2, 16.  The spoil takes up more space than it
did before excavation, and as a result there is more spoil than
necessary to restore the original contour.[6]  Raven Crest
suggested placing some of this extra material back on the mining
site (or "overstacking" it), thus making it higher than before,
and also placing some spoil at an adjacent permit site.
Application 17.  Both of these measures eliminated the need for

---

[6] Other problems also affect restoring the site to its prior
state.  For instance, the fill must be placed in a stable manner
to reduce the risk of slides, and sediment may flow into nearby
streams, affecting water quality.  See W. Va. Dep't of Envtl.
Prot., AOC Final Guidance Document, at 8-9 (2004), available at
http://www.dep.wv.gov/dmr/new%20policies/Pages/default.aspx
(last accessed August 8, 2014).

creating valley fills.

After replacing the fill material on the site, Raven Crest proposed reconstructing the 12,000 feet of streams that were destroyed by mining, in roughly their prior locations, about ten years later, approximately a year after mining ceased. Application 22; Compensatory Mitigation Plan, A.R. Tab 49 at 15. The 2,600 feet of streams used for sediment control structures would also be restored.  Raven Crest also proposed, among other things, planting vegetation on the site, monitoring the site for at least five years to ensure it returns to its previous forest state, and repairing 4,800 feet of off-site streams "that lie immediately downstream and below the project area."  Id. at 22-25.

Raven Crest came to settle on its particular proposal by examining how possible alternatives might ameliorate environmental effects.  The alternatives included "not mining the project area; relocating the project; underground mining methods (deep, auger, highwall mining); surface mining methods (contour mining, mountain top removal, area mining); excess spoil disposal methods (placing all overburden material back on the mining site; placing excess spoil in various valley fill sites; hauling all excess spoil overburden material off-site); and sediment control placement options."  Id. at 6, 8-19.

16

Raven Crest decided their proposal was the least damaging alternative that also allowed them to acquire a sufficient amount of coal.  Id. at 19.

At the time that Raven Crest submitted its application to the Corps, the mining project had already been granted SMCRA and NPDES permits by the West Virginia Department of Environmental Protection.  Id. at 1.

C. The Corps' Permitting Process

The Corps published a public notice concerning the permit on June 29, 2010, soliciting comments from the public due by July 28, 2010.  A.R., Tab 8.  In eighteen separate e-mails with various exhibits attached, the Corps received the plaintiffs' objections on July 2, 2010.  A.R., Tabs 10-27. Among the plaintiffs' objections were that NEPA required the Corps to issue an EIS, and also that the permit should be denied because of the project's destructive effect on human health and the environment.  July 1, 2010 Letter from Margaret Janes to Richard Berkes, A.R., Tab 10, at 2, 6, 43.  Over the course of the next year, the EPA, Corps, and Raven Crest communicated with each other to attempt to resolve EPA concerns about the possible impacts of the project, including the adequacy of information used to find proposed alternatives, the degradation of the

17

aquatic ecosystem and cumulative effects on it, the proper
minimization of, and compensation for, the unavoidable impacts
of the mine, and the effects on low-income or minority
populations.  A.R., Tab 31.  On November 10, 2011, the
plaintiffs sent another letter to the Corps commenting on the
proposed project, with attachments concerning the environmental
and health effects associated with mining.  November 10, 2011
Letter from Margaret Janes to Corps Chief Ginger Mullins, A.R.,
Tab 69.  The Corps issued a final decision on August 10, 2012,
finding no significant environmental impact as set forth in its
combined EA/FONSI, and granting the § 404(b)(1) permit to Raven
Crest.  Decision, A.R., Tab 81.

D.  District Court Suit

          The plaintiffs filed the complaint in this case on
October 17, 2012.  They sue on behalf of their organizations and
their individual members, and allege that the Corps violated
NEPA, the CWA, and the Administrative Procedure Act ("APA"),
5 U.S.C. §§ 701-706.  Compl. ¶¶ 4, 13.  Generally, the
plaintiffs allege that the Corp failed to consider human health
effects and water quality impacts resulting from coal mining
when making its decision.  The water quality claims have been
settled, leaving only the health effects claims.

More specifically, there are four counts alleged in the complaint. All four counts claim that the Corps violated the APA's requirement that agency decisions not be "arbitrary, capricious, or contrary to law" because the Corps failed to properly adhere to the requirements of NEPA, the CWA, or agency regulations. 5 U.S.C. § 706(2)(A) (2012). Compl. ¶¶ 34, 68, 74, 79, 84. Count I alleges that the Corps violated NEPA by failing to take a "hard look" at the water quality and human health impacts of permitting the mine and of the proposed mitigation plan, and that an EIS was required based on the administrative record. Compl. ¶ 67. Count II alleges the Corps did not make the appropriate water quality considerations required by the CWA. Count III alleges that the Corps violated the CWA by failing to consider significant adverse health effects when making the permitting decision. Count IV asserts that the Corps, in conducting its own "public interest" review under 33 C.F.R. § 320.4, was required to, but did not, consider the impacts on human health and welfare of the proposed mine.

The plaintiffs request that the court declare that the issuance of the permit and the failure to conduct an EIS were not in accordance with the APA, the CWA, and NEPA. Compl. ¶¶ 86-89. The plaintiffs also request injunctive relief in the form of a court order revoking the Corps' § 404 permit, and a

further injunction preventing the Corps from authorizing similar projects until it complies with the CWA and NEPA.  Compl. ¶¶ 90-91.  Finally, the plaintiffs request costs, attorney's fees and expert witness fees under 28 U.S.C. § 2412.  Compl. ¶ 92.

In this opinion and in the papers accompanying the parties' motions, only the claims regarding the effects on human health and welfare are at issue.  As noted, the water quality claims -- that is, Count II in its entirety and the water quality issues of Count I -- have already been settled by the parties, and they were voluntarily dismissed from this action pursuant to Fed. R. Civ. P. 41(a)(1)(A)(ii), by stipulation filed September 12, 2013.  The currently pending motions for summary judgment concern all of the remaining counts in this case.

On April 8, 2013, the plaintiffs moved for summary judgment on the human health and welfare issues (Count I residue and Counts III and IV).  With respect to NEPA, they make several arguments: (1) the Corps violated NEPA, CEQ regulations, and Corps regulations by failing to consider human health effects, which, if given proper consideration, would have resulted in a finding that an EIS is required, Pls.' Mem. Supp. Mot. Summ. J. 16-17, 22-27 [hereinafter "Pls.' Mem."]; (2) the Corps improperly limited the scope of the effects it considered under

20

its NEPA review, _id._ at 17-20; and (3) the Corps violated its NEPA regulations by improperly using a broader scope when analyzing benefits than when analyzing detriments of the proposed activity, _id._ at 20-22.

With respect to the CWA, the plaintiffs argue that the Corps should have considered, but did not, the human health effects of the proposed mine.  _Id._ at 27-28.  The adverse health effects of mining that the Corps allegedly ignored are identified in scientific studies that were presented in the plaintiffs' letters to the Corps, and also in scientific studies presented for the first time after litigation began.

The plaintiffs also argue that NEPA and the CWA required the Corps to consider the cumulative health effects of the proposed project when combined with other nearby mining operations, and that the Corps did not do so.  _Id._ at 28-29. Finally, the plaintiffs assert that they have standing.  _Id._ at 14-16.

Raven Crest filed opposition to the plaintiffs' motion and filed its own motion for summary judgment on the same issues on May 1, 2013.  Raven Crest was not initially a defendant, but was permitted to intervene as the company proposing the mining project.  Raven Crest argues that the Corps appropriately

21

limited its scope of review under NEPA and the CWA, and adequately responded to the studies the plaintiffs presented during the application process showing adverse human health effects by stating the studies were outside the Corps' scope of review. Raven Crest's Mem. Opp. Pls.' Mot. Partial Summ. J. and Supp. Raven Crest's Cross-Mot. Partial Summ. J. 6-10, 13-16 [hereinafter "Raven Crest Mem."]. Raven Crest also contends that in any event, the plaintiffs have provided no evidence that the specific mining project here will have detrimental health effects. Id. at 10-13. Raven Crest further argues that the Corps adequately addressed cumulative impacts under the CWA and NEPA by relying on state certifications of the project. Id. at 17-20. Finally, Raven Crest briefly argues that the plaintiffs do not have standing.

The Corps also filed its motion for summary judgment on the same issues on April 10, 2013. The Corps argues that it properly limited its own scope of review under NEPA to health effects resulting from the filling of jurisdictional waters, and therefore properly excluded the studies the plaintiffs argue it should have considered. Defs' Mem. Supp. Cross-Mot. Summ. J. 11-16 [hereinafter "Corps' Mem."]. It also argues that although the Corps conducts a public interest review, the public interest review is not a part of the Corps' NEPA review. Id. at 16. It

disputes that the CWA analysis was deficient in considering health effects and contends that the effects identified by the plaintiffs fell outside the Corps' scope of review; and it also asserts that the cumulative analyses under NEPA and the CWA were appropriate.  Id. at 17-23.

The court is vested with jurisdiction under 28 U.S.C. § 1331, as the issues constitute questions of federal law and no statute precludes the judicial review afforded by the APA.  See Lee v. United States Citizenship and Immigration Servs., 592 F.3d 612, 619 (4th Cir. 2010); see also Aracoma, 556 F.3d at 189 (reviewing similar NEPA and CWA claims under the APA).

## II. Standard of Review

The parties have filed motions for summary judgment. "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The APA "confines judicial review of executive branch decisions to the administrative record of proceedings before the pertinent agency." Shipbuilder's Council of Am. v. United States Dept. of Homeland Sec., 770 F. Supp. 2d 793, 802 (E.D. Va. 2011).  See also 5 U.S.C. § 706; Camp v. Pitts, 411 U.S. 138, 142 (1973).  No genuine issue of material fact exists

here because "the function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." Occidental Eng'g Co. v. INS, 753 F.2d 766, 769 (9th Cir. 1985). See also American Forest Res. Council v. Hall, 533 F. Supp. 2d 84, 89 (D.D.C. 2008). Accordingly, the questions presented are solely legal in nature, and summary judgment is warranted on the information contained in the administrative record.

Informal agency actions undertaken pursuant to the CWA and NEPA are judicially reviewable under the APA. 5 U.S.C. § 702 (2012); Aracoma, 556 F.3d at 192. The court will "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Our court of appeals has elaborated on the standard:

> In determining whether agency action was arbitrary or capricious, the court must consider whether the agency considered the relevant factors and whether a clear error of judgment was made. Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency. Deference is due where the agency has examined the relevant data and provided an explanation of its decision that includes a rational connection between the facts found and the choice made.

> The "arbitrary and capricious" standard is not meant to reduce judicial review to a "rubber-stamp" of agency

action.  While the standard of review is narrow, the court must nonetheless engage in a searching and careful inquiry of the record.  But, this scrutiny of the record is meant primarily to educate the court so that it can understand enough about the problem confronting the agency to comprehend the meaning of the evidence relied upon and the evidence discarded; the questions addressed by the agency and those bypassed; the choices open to the agency and those made.

Aracoma, 556 F.3d at 192-93 (internal citations and quotation marks omitted).


III. Analysis


A. Standing


1. Organizational Standing

The plaintiffs in this case are environmental organizations.  Organizations have standing to sue either when the organization itself is injured or when the organization acts as the representative of its members who would have standing to sue in their own right.  Friends of the Earth, Inc. v. Gaston Copper Recycling Corp., 629 F.3d 387, 396-397 (4th Cir. 2011). See also Warth v. Seldin, 422 U.S. 490, 511 (1975).  Here, the plaintiffs claim to "sue on behalf of their organizations and their members," Compl. ¶ 13, but allege no separate injury to their organizations apart from the injuries sustained by their members.  See National Treasury Emp. Union v. United States, 101

F.3d 1423, 1427 (D.C. Cir. 1996) ("[A]n organization suing on
its own behalf must demonstrate that it has suffered 'concrete
and demonstrable injury to [its] activities.'" (quoting Havens
Realty Corp. v. Coleman, 455 U.S. 363, 379 (1982))).  See also
Maryland Highways Contractors Ass'n, Inc. v. Maryland, 933 F.2d
1246, 1250-51 (4th Cir. 1991).  The court finds that the
plaintiffs' standing lies -- if anywhere -- solely in its
capacity to sue as a representative of its members.

        Representational standing rests in an organization
when: (1) at least one of its members has standing to sue in his
or her own capacity, (2) the interests sought to be protected
through litigation are "germane to the organization's purpose",
and (3) "neither the claim asserted nor the relief sought
requires the participation of individual members in the
lawsuit."  NRDC v. Watkins, 954 F.2d 974, 978 (4th Cir. 1992).
The second and third prongs here are not challenged.
Nevertheless, mindful of the court's own duty with regard to
jurisdictional issues such as standing, the court finds both of
these requirements are met.  The plaintiffs are environmental
groups seeking to declare the Corps' environmental review
insufficient.  The second prong is met, inasmuch as the
interests sought to be protected are germane to the
organization's purpose.  See, e.g., Hunt v. Washington State

26

Apple Advertising Comm'n, 432 U.S. 333, 343-344 (1977).  The
third prong is met because the claim presented is that an error
occurred in administrative function, and the relief requested is
not damages or injunctive relief specific to the standing
declarant, but rather a "purely legal ruling".  Thus,
participation of the individual members in this lawsuit is not
required.  See Bano v. Union Carbide Corp., 361 F.3d 696, 714
(2d Cir. 2004).

      What is contested here is whether any of plaintiffs'
members would have standing in their own right.  First, the
plaintiffs generally claim that their members "live, recreate,
flyover, use, and/or enjoy the natural and human environment
near these areas," that their "use and enjoyment of these areas
is reduced by these mining activities," and that "Plaintiffs'
members, their families, and/or their communities suffer health
problems that they believe come from living in the vicinity of
mountaintop removal mining, or are concerned that such health
problems will develop in the future."  Compl. ¶ 13.  But such
sweeping claims of injury, without more details, are
insufficient to confer standing.  See Summers v. Earth Island
Inst., 555 U.S. 488, 498-99 (2009).  Both the Supreme Court and
the Fourth Circuit have determined that organizations must "make
specific allegations establishing that at least one identified

member had suffered or would suffer harm." Summers v. Earth
Island Inst., 555 U.S. 488, 498 (2009) (emphasis supplied);
Southern Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand
at Broadlands, LLC, 713 F.3d 175, 184 (4th Cir. 2013). To
comply with this directive, the plaintiffs must name a specific
member and detail how he or she has been injured. Summers, 555
U.S. at 498-99; Southern Walk 713 F.3d at 185.[7]

The plaintiffs' standing here, therefore, must lie in
the standing of the one member that they specifically allege to
be affected: Ms. Nanette Nelson. Ms. Nelson only states in her
declaration that she is a member of OVEC and CRMW. Nelson
Declaration, Pls.' Mot. Summ. J., Ex. N. ¶¶ 3-5. Accordingly,
the court finds that Sierra Club and WVHC do not have standing,
as they have not put forth any member of their organization that
has alleged a concrete injury. See, e.g. Apalachicola
Riverkeeper v. Taylor Energy Co., LLC, Civ. Action No. 12-337,
2013 WL 1897142, at *4 n.26 (E.D. La., May 4, 2013). However,
OVEC's and CRMW's standing does depend on Ms. Nelson's standing,

---

[7] There is an exception to this identification requirement. When
"all the members of the organization are affected by the
challenged activity," there is no need to identify a specific
member that was harmed. Summers, 555 US at 499; NAACP v.
Alabama ex rel. Patterson, 357 U.S. 449, 459 (1958) (release of
membership lists harmed all members). But the plaintiffs do not
allege here that all of their members were harmed. See Southern
Walk, 713 F.3d at 184-85.

and the court now addresses it.[8]

### 2. Individual Standing

Article III of the Constitution imposes limits on who may bring suits.  To present a case or controversy under Article III, a plaintiff must (1) have sustained an injury-in-fact, (2) that injury must be "fairly . . . trace[able] to the challenged action of the defendant," and (3) it must be likely that the injury will be redressable through a favorable decision by the court.  Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-561 (1992) (quoting Simon v. Eastern Ky. Welfare Rights Org., 426 U.S. 26, 41-42 (1976)).

Raven Crest contends that the plaintiffs do not have standing to bring the present suit with respect to the CWA claims.  It first claims that there is no injury alleged that the plaintiffs will suffer health effects as a result of a change in water quality associated with the project, because the plaintiffs' standing declarant, Ms. Nelson, alleges that she currently does not use water from the streams for recreation or consumption.  Raven Crest Mem. 17.  In Raven Crest's reply

---

[8] The court notes that the plaintiffs briefed this case together, and the position of all four is exactly the same on all issues. Therefore, the court will continue to refer to the "plaintiffs" throughout the discussion, even though the court has found that two of the plaintiffs do not have standing.

brief, it challenges whether the plaintiffs' injuries are
redressable, claiming that all injuries alleged are past
injuries which already exist and would not be cured by the
relief requested.  Raven Crest's Reply Supp. Mem. Opp. Pls.'
Mot. Partial Summ. J. and Supp. Raven Crest's Cross-Mot. Partial
Summ. J. 13 [hereinafter "Raven Crest Reply"].

The complaint and Nelson's declaration do allege past
injuries associated with other instances of coal mining.  For
example, she claims that past coal mining has resulted in her
switching to city water from using well water, that she no
longer fishes in the Coal River due to past pollution, and that
her husband's leukemia and digestive ailments may be a result of
mining.  Nelson Declaration, Pls.' Mot. Summ. J., Ex. N, ¶¶ 9,
10, 11, 13.  Yet the documents also allege imminent future
injuries to Ms. Nelson associated with the issuance of this
permit that suffice for standing purposes.  She lives a quarter
mile from the mine site, can view the Big Coal River from her
home, and is concerned about the possible health effects, such
as cancer and lung problems, on her and her family that might be
associated with "living in close proximity" to the mine.[9]  Id. ¶¶

---

[9] Ms. Nelson's declaration refers simply to the "Coal River," of
which the Big Coal River is a tributary.  Only the Big Coal
River is located near the mining site, and the court infers that
Ms. Nelson lives near the Big Coal River.

8, 12, 13, 15.  Similarly, she expresses a concern that -- as has happened in the past with similar mines -- this mining project would foul the water of the Big Coal River by discoloring it and making it smell, possibly affecting the health of family members who get their drinking water farther downstream. [10]  Id. ¶¶ 9-12.

The aesthetic consequences of fouling of the river, which Ms. Nelson can see from her home, the fear of health consequences from discharges into the river, and the fear of health effects from proximity to the mine rise to the level of a sufficient injury in fact.  See, e.g., Aracoma, 556 F.3d at 194 n.10 (aesthetic interests enough for environmental injury); Friends of the Earth, Inc. v. Gaston Copper Recycling Corp. (Gaston II), 629 F.3d 387, 397 (4th Cir. 2011) ("Injury in fact is alleged adequately by environmental plaintiffs when they aver that they use the affected area and are persons for whom the aesthetic and recreational values of the area will be lessened by the challenged activity." (internal quotation marks

_____

It is noted that the Little Coal River and the Big Coal River both flow through Boone County, and meet to form the Coal River near the settlement of Forks of Coal in Kanawha County. United States Board on Geographic Names, Case Brief, Coal River (1960), available at http://geonames.usgs.gov/apex/f?p=gnispq:3::NO::P3_FID:1537464 (last accessed Aug. 11, 2014).
[10] Although Ms. Nelson states some of her concerns in the past tense, it is clear from the context that she fully expects the same problems to occur with this mine.

omitted)); <u>Friends of the Earth, Inc. v Gaston Copper Recycling Corp.</u> (<u>Gaston I</u>), 204 F.3d 149, 157 (4th Cir. 2000) ("He brings this suit to vindicate his private interests in his and his family's well-being -- not some ethereal public interest."); <u>Sierra Club v. United States Army Corps of Eng'rs</u>, 645 F.3d 978, 987-89 (8th Cir. 2011).  These are concrete interests that will be imminently affected if the mine goes forward.

Similarly, traceability exists because the permit would allow mining -- and the aesthetic and health effects that result from it -- to go forward.  <u>See</u> <u>Ohio Valley Environmental Coalition ("OVEC") v. United States Army Corps of Engineers</u>, 479 F. Supp. 2d 607, 619 (S.D. W. Va. 2007), rev'd on other grounds, <u>Aracoma</u>, 556 F.3d 177.  Redressability also exists inasmuch as the relief requested, namely, preparation of an EIS and a declaration that the permit is invalid, could result in the ultimate denial by the Corps of the permit application, or in the mitigation of the health risks that the plaintiffs identify. <u>Id.</u>  In addition, under NEPA, the plaintiffs only need show that the "decision could be influenced by the environmental considerations that NEPA requires an agency to study".  <u>Id.</u> (quoting from <u>Hall v. Norton</u>, 266 F.3d 969, 977 (9th Cir. 2001)).

The injuries alleged do not -- as Raven Crest argues

-- need to be connected to the plaintiffs' theory of why the Corps committed error.  That is, Ms. Nelson's injuries do not have to be a result of the aquatic discharges regulated by the Corps.  All that is required is that Ms. Nelson suffers some concrete injury arising from the Corps' decision that will be redressed by winning her case.  See, e.g., Duke Power Co. v. Carolina Environmental Study Group, Inc., 438 U.S. 59, 73-74 (1978) (environmental and aesthetic injuries of the operation of nuclear power plants by those living near them was sufficient to challenge the constitutionality of the Price-Anderson Act, which limited liability of those plants for nuclear accidents to $560 million); Aracoma, 556 F.3d at 194 n.10 (woman regularly taking photos in the area to be mined injured when the plaintiffs challenged the Corps' NEPA determinations with respect to the structure and function of streams); Kentuckians, 746 F.3d at 705 (injuries to "outdoor recreational pursuits" sufficient to confer standing to challenge the Corps' NEPA determinations on the basis that it did not consider human health effects); Sierra Club, 645 F.3d 987-89 (hunters had standing to challenge § 404 discharge activities under NEPA on the basis of light and noise pollution).

No party raises any of the so-called "prudential" standing concerns that arise out of "judicial self-governance"

rather than constitutional restrictions.  <u>Warth</u>, 422 U.S. at
498.  Such an inquiry is not jurisdictional and is subject to
waiver, and the court will not inquire into the issue in depth
<u>sua</u> <u>sponte</u>.  <u>See</u> <u>Ensley v. Cody Res., Inc.</u>, 171 F.3d 315, 320
(5th Cir. 1999).  It suffices to say that the court finds that
any prudential concerns, such as the "zone of interests" test,
are met because NEPA and the CWA were enacted for the protection
of public health and the environment, and violations of those
statutes are alleged by the plaintiffs.  <u>See</u> 42 U.S.C. § 4331(b)
(2006) (NEPA); 33 U.S.C. § 1251(a) (2006) (CWA); <u>OVEC</u>, 479 F.
Supp. 2d at 620.[11]

      Accordingly, the court finds that OVEC and CRMW have
standing.


B. NEPA

      The plaintiffs allege that the Corps acted arbitrarily
and capriciously, and thus in violation of the APA, by failing
to take the "hard look" at environmental consequences that NEPA
requires when issuing the CWA permit.  <u>See</u> <u>Robertson v. Methow
Valley Citizens Council</u>, 490 U.S. 332, 350 (1989); <u>NRDC v.
Morton</u>, 458 F.2d 827, 838 & n.22 (D.C. Cir. 1972).  Under that

[11] Similarly, no party raises the statutory standing question
under the APA.  <u>See</u> <u>Lujan v. Nat'l Wildlife Federation</u>, 497 U.S.
871, 882 (1990).  The court also finds that the requirements of
that inquiry are met.

review, the court must

> intervene not merely in case of procedural inadequacies, or
> bypassing of the mandate in the legislative charter, but
> more broadly if the court becomes aware, especially from a
> combination of danger signals, that the agency has not
> really taken a "hard look" at the salient problems, and has
> not genuinely engaged in reasoned decision-making.

Greater Boston Television Corp. v. FCC, 444 F.2d 841, 851 (D.C.

Cir. 1970).  See also Webster v. United States Dept. of

Agriculture, 685 F.3d 411, 421-22 (4th Cir. 2012) (describing

the "hard look" review in a NEPA case).  Inherent in this

evaluation is the question of what effects the Corps must

consider -- that is, the scope of the Corps' review.


        1. The Corps' Scope of NEPA Review

        The plaintiffs argue that the Corps improperly

disregarded the health studies that the plaintiffs submitted for

comment by arbitrarily limiting its scope of analysis to the

impacts resulting from the discharge of fill into jurisdictional

waters.  Pls.' Mem. 16-20.  The Corps and Raven Crest argue that

the Corps was simply following its own regulations regarding the

scope of analysis and is entitled to deference in interpreting

those regulations.


        The environmental effects to be considered by an

agency in a NEPA evaluation are those effects that the agency

"causes" by making the decision.  See Department of Transp. v.

Public Citizen, 541 U.S. 752, 767 (2004).  Causation in this
sense is analogous to the "familiar doctrine of proximate cause
from tort law."  Id. (quoting Metropolitan Edison Co. v. People
Against Nuclear Energy, 460 U.S. 766, 774 (1983)).  "[C]ourts
must look to the underlying policies or legislative intent in
order to draw a manageable line between those causal changes
that may make an actor responsible for an effect and those that
do not."  Id. (quoting Metropolitan Edison, 460 U.S. at 774,
n.7).

       NEPA does not define the Corps' scope of analysis, but
the Corps' own regulations define it as the "impacts of the
specific activity requiring a [Department of the Army] permit
and those portions of the entire project over which the [Corps]
district engineer has sufficient control and responsibility to
warrant Federal review."  33 C.F.R pt. 325, App. B(7)(b) (2013).
See Aracoma, 556 F.3d at 194.  The regulations list factors to
be considered in determining whether the Corps has control and
responsibility beyond the specific regulated activity:

          (i) Whether or not the regulated activity comprises
          "merely a link" in a corridor type project (e.g., a
          transportation or utility transmission project).

          (ii) Whether there are aspects of the upland facility
          in the immediate vicinity of the regulated activity
          which affect the location and configuration of the
          regulated activity.

          (iii) The extent to which the entire project will be

within Corps jurisdiction.

(iv) The extent of cumulative Federal control and responsibility.

33 C.F.R pt. 325, App. B(7)(b).  Ultimately, those effects that occur as a result of activities outside the Corps' jurisdiction and control cannot be said to be proximately caused by the Corps, and so those effects need not be considered in a NEPA review.  See Aracoma, 556 F.3d at 196.  In this case, the Corps analyzed the four factors just stated and limited the scope of its review to "the footprint of the regulated activity within the delineated water."  Decision 8-9.  The Corps relied primarily on the third and fourth factors, as WVDEP was responsible for the overall permitting of coal operations pursuant to SMCRA, so that federal control did not extend to the entire project.  Id.  In support the Corps cited the Fourth Circuit's decision in Aracoma, stating that its review is limited "to the narrow issue of the filling of jurisdictional waters as the upland areas are not within the Corps 'control and responsibility'".  Decision 8-9.  In reviewing the Corps' interpretation of its own regulations regarding the scope of review, the court is "cabined to assessing the reasonableness of that interpretation."  Aracoma, 556 F.3d at 177.

As the Corps notes, the Fourth Circuit had the opportunity to examine a somewhat similar surface mining

operation in <u>Aracoma</u>, opining with respect to the scope of the

Corps' NEPA review that:

> § 404 is itself unambiguous about what the Corps is
> authorized to permit under the CWA: the Corps "may issue
> permits, after notice and opportunity for public hearings
> <u>for the discharge of dredged or fill material into the</u>
> <u>navigable waters</u> at specified disposal sites." 33 U.S.C. §
> 1344(a) (2000) (emphasis added). The specific activity
> that the Corps is permitting when it issues a § 404 permit
> is nothing more than the filling of jurisdictional waters
> for the purpose of creating an underdrain system for the
> larger valley fill. In fact, the Corps has no legal
> authority to prevent the placement of fill material in
> areas outside of the waters of the United States. All
> other fill activity falls under the exclusive jurisdiction
> of the WVDEP, as the federally approved state SMCRA
> regulatory authority.

<u>Aracoma</u>, 556 F.3d at 194 (emphasis in original). The Fourth

Circuit also emphasized that interpreting the Corps'

jurisdiction more broadly would "effectively read out of the

equation the elaborate, congressionally mandated schema for the

permitting of surface mining operations prescribed by SMCRA,"

which gives the state of West Virginia "exclusive jurisdiction

over the regulation of surface coal mining and reclamation

operations." <u>Id.</u> at 195-96 (quoting 30 U.S.C. § 1253 (2000)).

In its 2014 <u>Kentuckians</u> case, the Sixth Circuit elaborated on

this rationale:

> The Corps decision [to limit its scope of NEPA review] is
> consistent with the congressional design of both NEPA and
> the regulatory scheme at issue. Regarding surface coal
> mining regulation, Congress intended that primary
> regulatory power be placed in only one agency, in this case
> the [state regulatory authority]. There are many
> considerations that must be balanced before authorizing a

> massive and environmentally significant operation, and
> Congress has determined that such a careful and sensitive
> decision is best made primarily by one decisionmaker.
> There are good reasons that Congress would not have
> designed a regulatory system in which each regulatory actor
> involved in a large operation, even in a comparatively
> minor way, is required to consider all of the effects of
> the overall project.

Kentuckians, 746 F.3d at 709.

The court pauses to note that the mine in this case is somewhat different from those in Kentuckians and Aracoma because there are no valley fills proposed here.  In those cases, at least in part the activity that the Corps was permitting was the "filling" of the waters in the valleys with excavated mine spoil.  See Aracoma, 556 F.3d at 194; Kentuckians, 746 F.3d at 704.  The lesser activity permitted by the Corps here is the mining through of streams and the construction of sediment ponds.  In one sense, mining through streams is not merely "filling" them, because the streams cease to exist while the mining-through operation removes the coal, followed by reconstruction of the streams.

More precisely, the activity for which the Corps issues permits is the "discharge of dredged or fill material into" the waters of the United States.  33 U.S.C. § 1344(a).  It is clear from the Corps' decision that the Corps considered the mine-through activities as those it could regulate under CWA

39

§ 404. Decision at 9-10 (discussing a § 404(b)(1) permit issuing "for the proposed sediment control ponds and mining through streams"). The plaintiffs acknowledge that these activities fall within the Corps' purview and do not challenge the Corps' decision in this regard. See Pls.' Combined Mem. Opp. Defs.' and Raven Crest's Cross-Mots. Partial Summ. J. and Supp. Pls.' Mot. Partial Summ. J. 6 [hereinafter Pls.' Resp.]. Indeed, Kentuckians included mining-through activities that the Corps determined to be within its scope of review. See Kentuckians for the Commonwealth v. United States Army Corps of Eng'rs, 963 F. Supp. 2d 670, 674 (W.D. Ky. 2013). As the plaintiffs point out, there is case law recognizing that the destruction and reconstruction of streams constitutes activity regulated under CWA § 404 for which the Corps must issue a permit. See, e.g., Borden Ranch Partnership v. United States Army Corps of Eng'rs, 261 F.3d 810, 814-15 (9th Cir. 2001) ("deep ripping" of wetlands to turn ranch into vineyard falls under § 404). See also United States v. Deaton, 209 F.3d 331, 335-36 (4th Cir. 2000) (deposition of dredged material back into same wetland falls under § 404); Rybacheck v. United States Envt'l Prot. Agency, 904 F.2d 1276 (9th Cir. 1990) (panning for gold and throwing waste back into same stream qualifies).

Plaintiffs, however, would have the scope of review

40

include the entire mine.  They attempt to distinguish this case

from Aracoma because the effects they wish the Corps to consider

-- that is, general human health effects resulting from coal

mining -- are in their estimation not considered at all under

the NPDES or SMCRA permitting schemes.  In essence, they argue

that WVDEP has no control over regulating the human health

effects of mining, so the Corps' control should not be limited

in that respect.  In support, they contend that Aracoma relied

on limiting the Corps' jurisdiction so as to not make the

WVDEP's regulatory process duplicative of the Corps' efforts,

but, plaintiffs say, those concerns do not exist when WVDEP

makes no analysis of the human health effects.  See id. at 196;

40 C.F.R. § 1506.2(b) (2013) ("[Federal] Agencies shall

cooperate with State and local agencies to the fullest extent

possible to reduce duplication between NEPA and State and local

requirements.").

     Even accepting for the purpose of argument that SMCRA

or NPDES permits do not require a consideration of human health

effects, the plaintiffs' argument is unavailing.  First, the

absence of state control over a particular activity does not

generally imply that federal control exists.  Federal control is

defined by the Constitution and federal law alone.  Second, the

reasoning for determining that the Corps properly limited the

scope of its "control and responsibility" in <u>Aracoma</u> was not merely that the Corps and the WVDEP might consider the same effects, but also that the expansive scope created by Congress for the SMCRA permitting scheme suggests that the scope of the Corps' permitting analysis is limited.  <u>See</u> <u>Aracoma</u>, 556 F.3d at 195 ("To say that the Corps has a level of control and responsibility over the entire valley fill project . . . is to effectively read out of the equation the elaborate, congressionally mandated schema for the permitting of surface mining operations prescribed by SMCRA.").  <u>See also</u> <u>Kentuckians</u>, 746 F.3d at 708 ("[G]iven the Corps's relatively minor role in the congressionally designed scheme for regulating surface mining, the Corps did not have sufficient control and responsibility over other aspects of the surface mining operation to warrant expanding the scope of its NEPA review."). Finally, even if the court were to accept the plaintiffs' argument that a plausible construction of the Corps' scope regulation is that it should have control and responsibility over the entire mining project, the Corps' regulation is at best ambiguous, and so the Corps' interpretation is entitled to deference.  <u>Aracoma</u>, 556 F.3d at 197.[12]

---

[12] In fact, the Corps addresses a situation like this as an example in its regulations:

Despite the plaintiffs' urging, Save Our Sonoran, Inc. v. Flowers, 408 F.3d 1113, 1124 (9th Cir. 2005) and White Tanks Concerned Citizens, Inc. v. Strock, 563 F.3d 1033, 1040 (9th Cir. 2009) are not applicable, as they did not deal with overlapping state and federal schemes. Aracoma, 556 F.3d at 197 n.11. In addition, Save Our Cumberland Mountains v. Kempthorne, 453 F.3d 334 (6th Cir. 2006), is also distinguishable because the scope of federal authority there was broader, as the federal Office of Surface Mining administers the SMCRA in Tennessee.

The court finds that the Corps was not arbitrary and capricious in limiting its scope to the "footprint of the regulated activity within the delineated water," rather than the entire mine. Decision 9. The court now turns to whether the Corps' analysis violated NEPA within that scope.

---

[I]f an applicant seeks a [Department of the Army] permit to fill waters or wetlands on which other construction or work is proposed, the control and responsibility of the Corps, as well as its overall Federal involvement would extend to the portions of the project to be located on the permitted fill. However, the NEPA review would be extended to the entire project, including portions outside waters of the United States, only if sufficient Federal control and responsibility over the entire project is determined to exist; that is, if the regulated activities, and those activities involving regulation, funding, etc. by other Federal agencies, comprise a substantial portion of the overall project.

33 C.F.R. pt. 325, App. B(7)(b)(3) (2013)(emphasis supplied).

2. The Corps' NEPA Analysis

    a. The Studies

    The court finds that the Corps did not abuse its discretion in excluding the studies presented by the plaintiffs.

    The plaintiffs presented to the Corps four academic articles that purport to show a connection between surface mining and detrimental human health effects. Pls.' Mem. Exs. D, E, G, H. Two of these were furnished on July 2, 2010, within the original comment period. The other two studies were conducted in 2011 and presented by the plaintiffs to the Corps in a "recomment" letter sent to the Corp on November 10, 2011.[13]

    The first article summarizes the results of other studies and concludes that various health ailments including pulmonary disorders, hypertension, lung cancer, heart disease, lung disease, and kidney disease are elevated in Appalachian counties with greater coal production. Pls.' Mem. Ex. D. The

_____

[13] The plaintiffs also presented an additional letter to the Corps after the permit was issued that addressed a multitude of mines in the area and cited additional studies. Then, they submitted fifteen more studies to this court as an appendix to their motion for summary judgment. While the plaintiffs did not argue that the Corps should have issued a revised EA after viewing this information, the studies presented show only general health effects associated with mining rather than discharge-related effects. The Corps did not abuse its discretion in not considering them. See 40 C.F.R. § 1502.9, Kentuckians, 963 F. Supp. at 684.

second study found, among other things, statistically
significant correlations between three factors in West Virginia:
a decrease in stream ecological quality, an increase in cancer
mortality rate, and an increase in proximity to and intensity of
coal mining.  Pls.' Mem. Ex. E.  The third and fourth studies
found statistically significant correlations between proximity
to mountaintop coal mines and health-related quality of life and
birth defects, respectively.  Pls.' Mem. Exs. G, H.

     The plaintiffs contend that the discharge of dredged
or fill material here, specifically, "mining through" of
streams, is really just mining, so the Corps should have
considered the general health effects from coal mining that the
articles reflect.  Pls.' Resp. 7; Pls.' Closing Brief 11.  The
defendants do not respond, instead focusing on their view that
the cited studies do not address the discharge of dredged or
fill material and that the cited studies do not show a causal
relationship.

     Both the Corps and Raven Crest argue that the articles
do not address how the discharge of dredged or fill material in
this project would cause human health effects.  They contend
that the articles do not identify health effects generated by
the discharges regulated by the Corps.  Defs.' Combined Reply
Pls.' Opp. Defs.' Cross-Mot. Partial Summ. J. and Reply Supp.

Defs.' Cross-Mot. Partial Summ. J. 7 [hereinafter Corps' Reply];
Raven Crest Mem. 10-13.  In addition, Raven Crest argues that
the correlation presented by the studies does not imply any
causal connection whatsoever between mining and detrimental
health effects.  Raven Crest Reply. 6-8.

       The court finds that the Corps was not unreasonable in
excluding the studies as outside its scope of review for the
reason that the articles do not contemplate that the health
effects were caused by the type of discharges associated with
this mine.  The third and fourth articles show health effects
associated with proximity to surface coal mines, with no stated
connection to discharges in streams.  The first article merely
summarizes other studies and lists the probable health effects
associated with coal mining in general.  The second article
analyzes stream ecological conditions in general and shows it
correlates to detrimental health effects and coal mining
intensity, but does not explicitly connect the stream conditions
to coal mining discharge.

       The Corps' interpretations of what their own
regulations require with regard to the scope of their NEPA
inquiry are entitled to due deference.  As the plaintiffs
suggest, it is plausible for the Corps to find that mining-
through activity is mining and that the health effects resulting

from discharge are the same health effects that result from
mining.  See 33 C.F.R pt. 325, App. B(7)(b) (the scope includes
the "impacts of the specific activity requiring a [Department of
the Army] permit").  However, it is also plausible to interpret,
as the Corps appears to have done here, that the relevant health
effects it must consider under NEPA are those effects that are
associated with discharges into the water supply.  In that
interpretation, exclusion of these studies was reasonable.  The
court notes that the plaintiffs' argument focuses on whether the
Corps should have considered broad human health effects
associated with coal mining, based on an assumption that the
Corps impermissibly limited its scope of review.  At no point do
the plaintiffs appear to argue that the Corps was unjustified in
excluding these studies if the limited scope of review adopted
by it is deemed acceptable.

      As the plaintiffs point out, the court may only judge
the propriety of the Corps' actions based on the justifications
proposed by the Corps at the time of its decision; post-hoc
rationalizations are not valid.  See Burlington Truck Lines,
Inc. v. United States, 371 U.S. 156, 168 (1962).  But contrary
to the plaintiffs' argument, the position taken by the Corps is
not a post-hoc rationalization formed for litigation.  Part of
the Corps' basis for its exclusion of the plaintiffs' studies

47

was that "References concerning public health have been reviewed.  These issues are not within the purview of the Corps' regulatory authority, but are considered by WVDEP during the SMCRA permitting process . . . ."  Decision, Ex. G-2, at 11. Regardless of whether the Corps is correct that these issues are considered in the SMCRA process, the Corps nevertheless concluded that the studies are outside its scope of review.  The Corps' decision defining its NEPA scope of review expressly indicates that a scope including the entire mine is "not appropriate".  Decision at 9.

Moreover, the Corps actually engaged in a review of the discharges' effects on human health.  The Corps assessed possible effects of discharge on stream quality and made an "independent judgment" that the discharge activities would not violate water quality standards.  Decision 25-28.  The Corps also foresaw no adverse effect on private or municipal water supplies.  Decision 33.  See Kentuckians, 746 F.3d at 711 (Corps' response to EPA request of review of health impact on poor and minority populations sufficient as a consideration of health effects).

The court finds that the Corps was not arbitrary or capricious in determining that the articles presented were not

48

within its scope of review.[14]

      b. Cumulative effects

        The plaintiffs argue that the Corps failed to assess the cumulative health impact of the mine in combination with other mines in the area.  Pls.' Mem. 28.  NEPA requires an agency to prepare an Environmental Impact Statement ("EIS") for "major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(C) (2006).  Under the Council on Environmental Quality ("CEQ") regulations, cumulative impact bears on the significance of the Corps' action.  40 C.F.R. § 1508.27 (2013).  CEQ regulations define cumulative impact as "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions."  40 C.F.R. § 1508.7 (2013).

---

[14] The court notes that this finding should not be construed as an endorsement by the court that coal mining does not cause adverse health effects.  The court regards, as without merit, Raven Crest's argument that the Corps could simply ignore the articles presented because, Raven Crest suggests, correlation does not imply causation.  Raven Crest Reply 6-8.  It is true that correlation does not necessarily imply causation.  Yet, science proceeds through finding correlations, and causation may in a given instance be inferred therefrom by ruling out certain hypotheses.  See United States v. Mosley, 454 F.3d 249, 266 (3rd Cir. 2006).  Proper criticism of a scientific study lies in its methodology and the causal factors ruled out by the study.

The plaintiffs acknowledge that the Corps engaged in some cumulative impact analysis, but allege the Corps needed to consider cumulative effects of mining on human health.  Pls.' Mem. at 29.  Again, the plaintiffs broaden the Corps' NEPA scope of review beyond the scope that the Corps determined for itself. The "incremental impact of the action" at issue in this case is confined by the scope of the Corps' NEPA review for issuing the permit; thus, it is the incremental impact of discharges into jurisdictional waters.  The plaintiffs have not provided any information on the effects on human health resulting from the filling of jurisdictional waters.  See Hoosier Envtl. Council, Inc. v. United States Army Corps of Eng'rs, 105 F.Supp.2d 953, 980-81 (S.D. Ind. 2000) (upholding Corps' decision to limit its cumulative impact scope); Water Works & Sewer Bd. of the City of Birmingham v. United States Dept. of the Army, Corps of Eng'rs, 983 F. Supp. 1052, 1067 (N.D. Ala. 1997) .

Moreover, the Corps' cumulative impact analysis did account for identifiable adverse health effects resulting from the discharges into jurisdictional waters.  The Corps analyzed water quality, the impact on aquatic organisms, possible changes in stream length, and changes in functional capacity.  Decision 39-47.

The court finds that the Corps' cumulative impact analysis under NEPA was not arbitrary or capricious.

### c. The Scope of Benefits Versus Detriments

The plaintiffs insist that the Corps violated its NEPA regulation that states, "[i]n all cases, the scope of analysis used for analyzing both impacts and alternatives should be the same scope of analysis used for analyzing the benefits of a proposal" because it did not consider human health effects. 33 C.F.R. pt. 325, App. B (7)(b)(3) (2013).

The plaintiffs argue that the Corps valued "continued employment, income, local economy, tax base, and energy needs" without acknowledging broad effects on human health from mining. As already determined, the health effects beyond that associated with the filling of jurisdictional waters were outside the Corps' scope of review. Accordingly, there would be no justification for the Corps to consider human health effects that the plaintiffs desire. And, although the Corps did not strictly comply with the prescription of the cited NEPA regulation by considering these economic benefits while limiting the scope of the health effects to the filling of jurisdictional waters, these considerations, in this instance, were harmless inasmuch as the Corps is found to have adequately studied the

proposed activity and taken a hard look at the relevant

environmental consequences of its decision.  See Kentuckians,

746 F.3d at 712 ("The content of the analysis is rational and

thorough. That ends the inquiry.").


C. CWA

        1. Consideration of Human Health Effects

        The plaintiffs contend that the Corps violated the

Clean Water Act because the Act required the Corps to consider

human health effects.  Pls.' Mem. 27-28.  Specifically, they

allege that the Corps violated EPA regulation 40 C.F.R. §

230.10(c)(1) (2013), which mandates in relevant part:

> [N]o discharge of dredged or fill material shall be
> permitted which will cause or contribute to significant
> degradation of the waters of the United States. . . . Under
> these Guidelines, effects contributing to significant
> degradation considered individually or collectively,
> include: (1) Significantly adverse effects of the discharge
> of pollutants[15] on human health or welfare, including but
> not limited to effects on municipal water supplies,
> plankton, fish, shellfish, wildlife, and special aquatic
> sites.

The plaintiffs do not specify what potential health effects

resulting from discharges the Corps was supposed to consider,

---

[15]    The term pollutant means dredged spoil, solid waste,
incinerator residue, sewage, garbage, sewage sludge,
munitions, chemical wastes, biological materials, radioactive
materials not covered by the Atomic Energy Act, heat, wrecked
or discarded equipment, rock, sand, cellar dirt, and
industrial, municipal, and agricultural waste discharged into
water.
40 C.F.R. § 230.3 (2013).

other than repeating their argument that the articles they
presented show negative health effects.  As already discussed,
those articles do not connect discharge into water with human
health effects, but discuss mines and health in general.
Furthermore, the Corps did engage in a review of known potential
human health effects, by analyzing possible effects on water
quality and municipal water supplies.  Decision 25-35.  The
court finds that the Corps was not arbitrary or capricious by
not considering the articles in its CWA analysis.


    2. Cumulative Effects

    The plaintiffs argue that the Corps did not consider
cumulative impacts related to human health that it asserts are
required under the CWA.  They contend that when the CWA
guidelines state that effects must be considered "individually
or collectively," 40 C.F.R. § 230.10(c), "collective" has the
same meaning as "cumulative" under NEPA.

    Even assuming, without deciding, that the plaintiffs
are correct in that contention, the scope of the CWA review (and
the NEPA review) is limited to those effects arising from the
"discharge of dredged or fill material."  The plaintiffs do not
point to any adverse health effects arising from those discharge
activities.  Consequently, the Corps' CWA review was not in that

respect arbitrary or capricious.  See supra Part III.B.2.c., at pp. 49-51.


D.  Public Interest Review

        Finally, the plaintiffs argue that the Corps violated the terms of its "public interest" review under 33 C.F.R. § 320.4 (2013) by failing to consider the human health effects associated with coal mining.[16]  Pls.' Mem. 27-28.  Among the criteria considered in that review are "in general, the needs and welfare of the people."  Id.  The regulations further provide:

> The specific weight of each factor is determined by its importance and relevance to the particular proposal. Accordingly, how important a factor is and how much consideration it deserves will vary with each proposal. A specific factor may be given great weight on one proposal, while it may not be present or as important on another. However, full consideration and appropriate weight will be given to all comments, including those of federal, state, and local agencies, and other experts on matters within their expertise.

Id. § 320.4(a)(3).  The plaintiffs argue that negative health effects among residents near surface mines should have been considered under the welfare criterion, and that the public interest review is not limited to the filling of jurisdictional waters, but instead is a much broader inquiry.  Pls.' Resp. at 18-19.  The Corps, of course, contends that the scope of the

---

[16] They do not argue that other aspects of the public interest review were improper or outside the scope of that review.

public interest review was limited -- as with the NEPA review
and the CWA review -- to the impacts associated with the
regulated discharges rather than the impacts of the mine as a
whole, and the Corps believes its evaluation was sufficient
within that scope.  Corps' Reply 12.

     In its decision, the Corps does not outline the
specific scope of its public interest review.  It is the case
that the Corps did not examine the human health effects raised
by the plaintiffs because they were deemed beyond the Corps'
purview.  Thus, the scope used by the Corps for human health
effects (and now urged by the Corps in argument) is the same for
the NEPA, CWA, and public interest analyses.  The court finds
this implicit determination of the scope of the public interest
review to be neither arbitrary nor capricious.  Indeed, the
court is satisfied that the scope of the public interest review
may be no greater than that of the CWA review.  First, the
impacts the Corps examines in the public interest review are the
"impacts . . . of the proposed activity."  33 C.F.R. § 320.4
(emphasis added).  See Water Works, 983 F. Supp. at 1067-68.  As
emphasized above, the "proposed activity" here constitutes the
discharge of dredged or fill material into jurisdictional
waters.  Second, the authority to conduct the public interest
review stems from the authority granted to the Corps under the

CWA.  See Final Rule for Regulatory Programs, 51 Fed. Reg. at 41,220.  Accordingly, the scope of the public interest review may not exceed the scope of the Corps' authority under the CWA -- it is restricted to the "filling" of jurisdictional waters. See Water Works, 983 F. Supp. at 1067-68.

IV.

The parties have already settled their water quality claims, and the pending motions for summary judgment encompass all of the remaining claims as set forth in the remainder of Count I and in Counts III and IV for relief by the plaintiffs.

The court having concluded that the Corps has not acted arbitrarily or capriciously in the issuance of the permit at issue, it is, for all of the reasons set forth herein, ORDERED as follows:

1.   The plaintiffs' motion for partial summary judgment, filed April 8, 2013, be, and it hereby is, DENIED;

2.   The Corps' motion for partial summary judgment, filed May 10, 2013, be, and it hereby is, GRANTED;

3.   Raven Crest's motion for partial summary judgment, filed May 10, 2013, be, and it hereby is, GRANTED;

4.   This action be, and it hereby is, stricken from the docket.

The Clerk is directed to transmit copies of this order to all counsel of record and any unrepresented parties.

DATED: August 18, 2014

John T. Copenhaver, Jr.
United States District Judge